**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SEP 2 9 2005

MATTHEW J. DYKMAN
CLERK

TONI WITT,

      Plaintiff(s),

vs.

      CIVIL NO.04-207 RB/LFG
      consolidated with
      04cv1179RB/LFG

CHARLES EUGENE PERDUE and
ALBERT ERNEST YOUNG,

      Defendant(s).

## FINDINGS AND RECOMMENDATIONS IN RESPONSE TO PLAINTIFF WITT'S OBJECTIONS AND AMENDED OBJECTIONS TO THE FINDINGS OF THE MAGISTRATE JUDGE

      This matter came before the Court on Defendant Albert Ernest Young's Motion to Dismiss Plaintiff's Complaint Under Rule 37 of the Federal Rules of Civil Procedure (Docket No. 45). The Court filed Findings and Recommendations of the Magistrate Judge on August 15, 2005. (Docket No. 24[1]) Plaintiff filed objections to those findings on August 24, 2005 (Docket No. 26) and amended objections (Docket No. 27) on September 1, 2005.

      Plaintiff raises two direct factual challenges to the findings of the Magistrate Judge. First, Plaintiff questions the Magistrate Judge's finding that no rotator cuff tear was found during the Plaintiff's first surgery. Plaintiff references the medical records of Dr. Wayne Keeling (December 23,

---

      [1]The out-of-sequence docket number results from the consolidation of these two cases. The Defendant's motion was filed under the original docket number, 04cv207. The Magistrate Judge's findings and Plaintiff's objections were filed after consolidation and are the 24th, 26th and 27th entry under docket number 04cv1179.

1



2002); Dr. Frank Rowan (April 9, 2002); and Dr. Gary Poehling (January 13, 2002). None of the above cited records involve surgery, however, as the first surgery occurred on January , 2003. The doctors cited by Plaintiff were interpreting MRIs or other diagnostics, and the Court is well aware that they believed, before surgery, that the films in question showed a partial tear. In fact, the pre-operative diagnosis for Plaintiff was "Right shoulder impingement syndrome, possible rotator cuff tear." (See Exhibit 1, attached hereto.) In his surgical report, Dr. Ethan Wiesler reported that he inspected the rotator cuff and it was found to be intact. Dr. Wiesler's post operative diagnosis was "Right shoulder impingement syndrome." The Plaintiff's objection on this ground is not well taken.

Plaintiff further contests the Magistrate Judge's findings that in November of 2003 Plaintiff fell during a scuffle with her sons and reinjured her right shoulder. Plaintiff claims that that incident actually occurred in November of 2004, which would place the incident after all three of Plaintiff's surgeries. Plaintiff's second surgery occurred on December 16, 2003, and during that surgery a rotator cuff tear was observed and repaired. The significance of the date of injury is clear. If the rotator cuff was not torn in January 2003, but a tear was found in December 2003, five weeks after Plaintiff fell and reported to her doctor that she had reinjured her shoulder, the December surgery would be linked to that fall, not to the automobile accident of 2001.

Notwithstanding the critical importance of the date of the injury, Plaintiff's objections merely state that it occurred in 2004, and no effort was made to attach the relevant medical documents that are readily accessible in the file. Those documents are attached here as Exhibit 2, and they show clearly that the incident in question occurred in 2003, five or six weeks before the second surgery, as was stated in the original recommended findings. The Court further notes that the same mistaken date is the foundation for Dr. John P. McGee's April 13, 2005 report, to which Plaintiff refers in her

2

objections. To the extent that Dr. McGee based his opinion on the mistaken belief that Plaintiff fell and reinjured her shoulder in November 2004, rather than November 2003, his opinion has no evidentiary value. Plaintiff's objection on this ground is not well taken.

Plaintiff also reiterates that she was an innocent victim of the accident, and therefore should be compensated. This argument misses the point of the issue before the Court. At no time has the Court held the Plaintiff responsible for causing the initial injury she sustained in the accident. At issue is Plaintiff's conduct during discovery, and her lack of candor in providing information to the Defendant and in her representations to the Court. The Court does not accept Plaintiff's assertion that the errors in her answers to interrogatories were "minor and irrelevant." To the contrary, they went to the heart of her damages claim.

Furthermore, Plaintiff was not forthright in her response when asked about subsequent shoulder injuries during her deposition. Plaintiff was asked directly whether she had fallen and hurt her right shoulder since the accident. She answered "No." (See Exhibit 3, Plaintiff's deposition transcript, p. 80, lines 9-11) Plaintiff was then confronted by Defense counsel with her January 2004 medical records relating to a shoulder injury resulting from a fall at church. After a colloquy that can best be described as quibbling over the definition of "fall", ("I just kind of leaned up against the car. I never fell down, down." p. 81, lines 18-19) Plaintiff finally admitted that she did go to the hospital to seek treatment after this incident, and that she should have revealed this in her answers to interrogatories.

Immediately thereafter, Defense counsel asked Plaintiff "Did you ever get into an altercation with you son and hurt your shoulder?" Plaintiff's response was again unequivocal: "No." (p. 83, lines 9-11) Only when confronted with additional hospital records did Plaintiff admit that the correct

3

answer to the question was "yes." (p. 83, line 19) These responses belie Plaintiff's claim in her objections that she was "candid in all of her answers" at her deposition. To the contrary, the Court continues to believe that Plaintiff was intentionally deceptive, particularly with regard to subsequent injuries to her shoulder. Furthermore, the Court stands by its original conclusion that Plaintiff failed to reveal her subsequent shoulder injuries in an attempt to increase the monetary value of her damages claim by creating the false impression that all three of her surgeries resulted directly from the automobile accident.

The Court remains concerned about the conduct of Plaintiff's attorney. As shown above, the medical records are clear as to the sequence of injuries and treatments. Yet, Plaintiff's attorney, through design or failure to properly ascertain that sequence, continues to argue facts before the Court which are inaccurate.

In the Court's opinion Plaintiff's objections are not well taken. The Court stands by its original findings and recommendations.

**W. DANIEL SCHNEIDER**
**United States Magistrate Judge**

EXHIBIT 1

FOREST UNIVERSITY ~~TIST~~ MEDICAL CENTER
.ICAL CENTER BOULEVARD
.NSTON-SALEM, NC  27157

NAME: WHITT, TONI LARAE
NCBH#:01687856

------------------------------------------------------------

THIS IS A CONFIDENTIAL REPORT PRINTED FROM LASTWORD AND MAY BE UNAUTHENTICATED.
Do not release without patient, legal representative or proper authorization.
Please place in patient record or discard by shredding or tearing to protect
patient confidentiality.
REFERENCE:  Medical Center's Confidentiality Agreement Covering Disclosure of
Patient/Provider Information and Computer Access and Responsibilities.

------------------------------------------------------------

OP

OPERATIVE NOTE

WHITT, TONI LARAE
NCBH # 168-78-56

Ethan Ron Wiesler, MD
Date  01/16/2003
Room  AMBS

PREOPERATIVE DIAGNOSIS: Right shoulder impingement syndrome, possible
rotator cuff tear.

POSTOPERATIVE DIAGNOSIS: Right shoulder impingement syndrome.

PROCEDURE: Arthroscopic subacromial decompression.

ATTENDING SURGEON: Ethan Wiesler, M.D.

..SSISTANT: Derrick Hickey, M.D.

ANESTHESIA: Regional.

ESTIMATED BLOOD LOSS: Minimal.

COMPLICATIONS: None.

INDICATIONS FOR PROCEDURE: Toni Whitt is a 39-year-old right hand dominant
female with a long history of right shoulder pain exacerbated by overhead
activity.  Physical examination was consistent with impingement syndrome
and possible rotator cuff tear.  Magnetic resonance imaging demonstrated a
possible tear of the supraspinatus tendon, which was probably partial
thickness.

DESCRIPTION OF PROCEDURE: Following induction of regional anesthetic by the
Anesthesiology Service the patient was placed in the beach chair position
on the operating room table.  All bony prominences were padded.
Arthroscopic evaluation of the joint was performed from the usual
glenohumeral posterior portal. There was no intraarticular pathology noted.
Attention was turned to the insertion of the supraspinatus tendon and it
appeared to be well fixed to the greater tuberosity with no evidence of a
full thickness rotator cuff tear.  Following this the arthroscope was
placed in the subacromial space.  The bursa was found to be quite
hypertrophic. A full bursectomy using the Arthricare ablation was performed
s well as the shaver used to take the bursa completely from the lateral
aspect of the acromion medially to the acromioclavicular joint.  The
acromioclavicular joint was identified but not debrided.  Following a full
bursectomy once again the supraspinatus ten~~            ~~ well as the

**EXHIBIT** 8

FOREST UNIVERSITY ~~TIST MEDICAL CENTER
ICAL CENTER BOULEVARD
.NSTON-SALEM, NC  27157

NAME: WHITT, TONI LARAE
NCBH#:01687856

------------------------------------------------------------------------

THIS IS A CONFIDENTIAL REPORT PRINTED FROM LASTWORD AND MAY BE UNAUTHENTICATED.
Do not release without patient, legal representative or proper authorization.
Please place in patient record or discard by shredding or tearing to protect
patient confidentiality.
REFERENCE:  Medical Center's Confidentiality Agreement Covering Disclosure of
Patient/Provider Information and Computer Access and Responsibilities.
------------------------------------------------------------------------
rotator cuff were examined from the bursal side and found to be intact.
The patient tolerated the procedure well. A sterile dressing was applied
and the patient was brought to the recovery room.


_____

ATTENDING SURGEON


DGH/kf    D 02/19/2003    T 02/21/2003   R 02/22/03dp   Doc # 1431688   Job #
235305

cc:   Ethan Ron Wiesler, MD
      WFU Baptist Medical Ctr

LABEL:  TRXMSTR                    COPY              PRINTED      10/18/20
                                                    BY HESTER, MARLE

MED 000103

EXHIBIT 2

WITT, TONI
DOB: 9/15/1963    (Age: 40)    Sex: F    MR#: 0214407
TE OF SERVICE: 11/27/2003

**HISTORY OF PRESENT ILLNESS**

Exam time: 10⁰⁰    Hx by: (Patient) Family EMS NH Translator    Limited by: ALOC Intoxication Severity Dementia

C/C/HPI: (Narrative): C/o R Shoulder Pain. Thinks pulled something recently few days ago

Prior Rotator Cuff Surgery 10 mnths ago

Timing: Sx started suddenly / gradually __ min. / hrs. / (days) / wks. ago : continuous / intermittent

Duration: Sx last __ min. / hrs. / days / wks. at a time : present / absent

Location: (R Shoulder) humerus elbow forearm    L shoulder humerus elbow forearm

Quality: cannot describe "pain" swollen redness laceration numbness tingling

Severity: (mild) moderate severe 1-10 scale __

Context: (accident) sports related fall altercation spontaneous MVA

Exacerbated by: nothing (movement) (palpation)    Relieved by: nothing rest OTC meds

Assoc. Symptoms: (none) pain bleeding swelling fever joint pain

**REVIEW OF SYSTEMS**

Limited by: ALOC Intoxication Severity Dementia

Constitutional: fever chills weakness diaphoresis    Neurological: HA seizures weakness confusion

ENT: sore throat ear pain facial pain    Psychological: anxious depressed

Eyes: pain visual changes    Endocrine: polyuria polydipsia

Cardiovascular: C.P. palpitations DOE PND    Integument: rashes pruritus lesions

Respiratory: S.O.B. cough congestion    Hematological: anemia bleeding disorders transfusion

Gastrointestinal: N/V D/C melena hematemesis    Allergy/Immuno: frequent infections allergies hives

GU: flank pain dysuria hematuria frequency    Other:

Musculoskeletal: joint pain neck / back pain ext pain

(YES) NO All Other Systems Reviewed And Are Negative

**MEDICAL AND SOCIAL HISTORY**

Med. Hx: none CAD HTN IDDM / NIDDM shoulder dislocation bursitis

Past Med. Hx: asthma

Meds: albuterol inhaler prn, singulair 10mg 1 qd

Allergies: nka

Surgical: none Appy Chole Hyster

Family Hx: negative    R / L Handed    Lives Alone: Y / N

Social Hx: Tobacco Y / N __ Packs/Day __ Years    ETOH: Y / N Drinks/Wk.    Drugs: Y / N

Occupation:

Immunizations: Up-to-date: Y / N    Tetanus: under 5 yr    MED 000389

Productive: LMP: 2 WKS AGO    G    P    AB

**Pro-MED Maximus**
©Copyright 2001 Pro-MED Clinical Systems, L.L.C.

**Upper Extremity / Arm / Shoulder- Page 1 of 2**
Rev. 05/30/02

# Memorial Hospital of Med

(Instructions: circle positive - / slash negative, provide additional pertinent information.)

| NAME: WITT TONI | PT#: 401070118 | DATE OF SERVICE: 11/30/2003 |
|---|---|---|
| DOB: 9/15/1963 | MRN: 274907 | Pres Name: |
| Sex: | Age: 40 yrs / mos / days / wks | Age Title: |
| Chief Complaint: SHOULDER INJURY | | |
| Medicine: albuterol inhaler prn singular | | |
| Allergies: nka | | |
| EDP: RUBIN GORDON | | |

## HISTORY OF PRESENT ILLNESS

Exam Limit: (Patient) Family   EMS   NH   Translator   Critical   ALOC   Intoxication   Severity   Dementia

C / C / HPI: (Narrative):

(R) shoulder pain, (R) hand pain
h/o rotator cuff injury. Pt stated
was at dentist, hit (R) shoulder to (R)
does not recall what injury
hand, but pain

**Timing:** Sx started suddenly / gradually   ½ min. (hrs) / days / wks. ago : continuous / intermittent

**Duration:** Sx last   1 (min / hrs) days / wks. at a time : present / absent

**Location:** (R Shoulder)   humerus   elbow   forearm   L shoulder   humerus   elbow   forearm

**Quality:** cannot describe  ("pain")  swollen   redness   laceration   numbness   tingling

**Severity:** mild   (moderate)   severe   1-10 scale

**Context:** (accident)   sports related   fall   altercation   spontaneous   MVA

**Exacerbated by:** nothing   (movement)   palpation          **Relieved by:** (nothing)   rest   OTC meds

**Assoc. Signs & Symptoms:** none   (pain)  bleeding   swelling   fever   joint pain

## REVIEW OF SYSTEMS

Critical   ALOC   Intoxication   Severity   Dementia

**Constitutional:** fever   chills   weakness   diaphoresis      **Neurological:** HA   seizures   weakness   confusion

**ENT:** sore throat   ear pain   facial pain               **Psychological:** anxious   depressed

**Eyes:** pain   visual changes                         **Endocrine:** polyuria   polydipsia

**Cardiovascular:** C.P.   palpitations   DOE   PND      **Integumentary:** rashes   pruritis   lesions

**Respiratory:** S.O.B   cough   congestion            **Hematologic:** anemia   bleeding disorders   transfusion

**Gastrointestinal:** N / V   D / C   pain / melena   hematemesis   **Allergy/Immuno:** frequent infections   allergies   hives

**GU:** flank pain   dysuria   hematuria   frequency      **Other:**

**Musculoskeletal:** joint pain   neck / back pain   ext. pain

YES / NO   All Other Systems Reviewed And Are Negative

## MEDICAL AND SOCIAL HISTORY

**Med Hx:** none   CAD   HTN   (IDDM) / NIDDM   shoulder dislocation   bursitis

**Past Med Hx:** asthma   (R) Shoulder   rotator cuff injury

**Meds:** albuterol inhaler prn, singulair 10mg 1 qd

**Allergies:** nka

**Surg Hx:** none   Appy   Chole   Hyster   (R) Rotator Cuff

**Family Hx:** negative                               R / L Handed   Lives Alone: Y / N

**Social Hx:** Tobacco Y / N   Packs/Day ___ Years   ETOH: Y / N   Drinks/Wk. ___   Drugs: Y / N

**Occupation:** n / a

**Immunizations:** Up-to-date: Y /(N)               Tetanus: under 5 yr

**GYN:** Prv Hx   LMP: 2 WKS AGO   G   P   AB

EXHIBIT 3

...t v. Perdue 
roni Witt

CIV-04-0207-WDS/LFG
February 4, 2005



Page 78

1    A. Yes, she did.
2    Q. And in what ways did she harass you at this
3  job?
4    A. When we got married, he bought me a car, and
5  she was there like every morning when I got there,
6  every lunch break, every day at 5 o'clock, telling
7  me, "This is my F-ing car now. You won't never have,
8  you won't never have him." Just stuff like that.
9    Q. And that was the reason, then, that you had
10  to stop working at that trucking company?
11    A. That is the reason I quit working.
12    Q. And when you quit working for them, for light
13  duty, who was your next employer?
14    A. It would have been a trucking company.
15    Q. That would have been Direct Transport?
16    A. Mm-hmm.
17    Q. And after you left Direct Transport, what was
18  the next company that you worked for?
19    A. Liberty Screen Printing, I think.
20    Q. And then after Liberty Screen, who was your
21  next person that you worked for?
22    A. Should have been Happy Days.
23    Q. Then who did you work for?
24    A. I was out for a little while from my
25  surgery. Then I went back to -- maybe I had already

Page 79

1  had my surgery before I worked for Happy Days. And
2  then I went and worked for Happy Days, and then it
3  was for People's General Store.
4    Q. And then after People's General Store, who
5  did you work for?
6    A. I was out of work again for surgery.
7    Q. Okay. Have you worked at all in the year
8  2005?
9    A. No.
10    Q. Have you been released to do any light duty
11  in 2005?
12    A. No.
13    Q. Okay. We've been going for about another
14  hour. Would you like to take a lunch break now?
15    MR. CAMACHO: No. She has to get back
16  on a bus, go back to North Carolina.
17    MR. HILL: We'll go for a while, we'll take a
18  small break to get a sandwich, then we'll continue.
19    (Recess taken.)
20    Q. Let's go back to the Answers to
21  Interrogatories. We've gone to No. 9. Let's go to
22  No. 10.
23    A. Go to No. 10?
24    Q. Yes. It indicates there, "Have you ever been
25  involved in any incident or accident, motor vehicle,

Page 80

1  on-the-job, or otherwise, resulting in injuries or
2  damages to any person or property during the 15 years
3  before the occurrence alleged in this case?"
4    Were there any accidents since the occurrence
5  alleged in this case? You've indicated to see
6  Interrogatory No. 4, which you talked about the
7  Worker's Compensation claim and the lawsuit in
8  Virginia.
9    Have you fallen and hurt your right shoulder
10  since this accident with Mr. Perdue?
11    A. No.
12    Q. This is medical document MED-413. I'm just
13  going to give you the beginning page. It indicates a
14  shoulder contusion. What church was it that you fell
15  at?
16    A. Christian Worship Assembly.
17    Q. Is it correct then when you fell, you injured
18  your right shoulder?
19    A. No.
20    Q. Did you fall there at the Christian?
21    A. No.
22    Q. And when it indicates there in the report of
23  a fall, that is not correct?
24    A. No.
25    Q. Do you recall that fall?

Page 81

1    MR. CAMACHO: Objection. She just
2  stated she didn't fall.
3    Q. Do you recall that incident?
4    A. Yes, I do.
5    Q. Is that report there in that document that I
6  have given to you an accurate report of how it
7  happened?
8    A. It's one page of it, yes.
9    Q. Is that accurate?
10    A. The date?
11    Q. The description of the incident.
12    A. No.
13    Q. What is the accurate description of the
14  incident?
15    A. It was ice on the ground and cars were going
16  round, and I picked Ethan, my grandson, up in my left
17  arm. I had a sling on my right arm. When I went to
18  open the door, I just kind of leaned up against the
19  car. I never fell down, down.
20    Q. Did you fall against your shoulder?
21    A. No.
22    Q. The reason I ask is I have MED-414, which is
23  the follow-up for that report. My question to you
24  is, is the documentation in that as to how the
25  accident happened accurate?

21 (Pages 78 to 81)

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505) 830-0600

EXHIBIT

609 12TH STREET NW
Albuquerque, NM  87102
e0c80d78-f136-4e98-a245-b880933dc878



_t v. Perdue
/oni Witt

CIV-04-0207-WDS/LFG
February 4, 2005

---

**Page 82**

1    A. No.
2    Q. Do you know what hospital it was that you
3  sought treatment for?
4    A. I don't see a name on it anywhere.
5    Q. Were X-rays taken?
6    A. Probably were.
7    Q. Were X-rays taken?
8    A. I mean, I don't recall. I'm looking to see.
9    Q. Do you have any recollection what treatment
10  you were given?
11    A. I don't know. Probably some pain pills and
12  told to protect it. I don't know.
13    Q. Would you agree that this was an incident
14  that produced an injury to your body?
15    A. No.
16    Q. How would you describe it?
17    A. I'm very protective of that shoulder. If you
18  hit it now, I'm going to go to see if anything's
19  wrong with it.
20    Q. Why didn't you list that incident in
21  Interrogatory No. 10?
22    A. I don't do these interrogatories.
23    Q. The question would be: Should, in your
24  judgment, to be accurate in Interrogatory No. 10,
25  should that incident be listed?

---

**Page 83**

1    A. Yes.
2    Q. Did you ever get into an altercation with
3  your son and hurt your shoulder, your right shoulder?
4    A. Can I have a second?
5    Q. Sure.
6    A. Not a break. I'm reading it.
7    Q. All right.
8    A. Okay.
9    Q. Did you ever get into an altercation with
10  your son and hurt your shoulder?
11    A. No.
12    Q. This is medical document MED-400, from
13  Memorial Hospital of Martinsville on 11-30 of 2003
14  with a chief complaint of "Right shoulder injury and
15  pain"; "Brief Assessment: Got in the middle of an
16  altercation with sons. Pain in right shoulder and
17  right hand."
18      Did that happen?
19    A. Yes.
20    Q. To be accurate, shouldn't that have been
21  listed in answer to Interrogatory No. 10?
22    A. Yes.
23      MR. CAMACHO: Objection, the
24  Interrogatory No. 10 says during the 15 years
25  before the occurrence alleged in this case.

---

**Page 84**

1      MR. HILL: Follow the next one.
2    Q. Or any accident since the occurrence alleged
3  in this case. My question would be, do you recall
4  this incident?
5    A. Yes.
6    Q. Tell me what happened.
7    A. My oldest son and my youngest son got into a
8  fight over my grandson. And I always have pain in my
9  shoulder, but it was my hand that was hurt.
10    Q. Did you complain at that time of right
11  shoulder pain?
12    A. I sure did.
13    Q. Since this accident involving Mr. Perdue,
14  have you had lower back pain?
15    A. I've had lower back pain all my life.
16    Q. So the answer would be yes, you have had
17  lower back pain since this accident with Mr. Perdue?
18    A. Yes.
19    Q. Have you ever noticed any change in that
20  lower back pain since this accident involving
21  Mr. Perdue?
22    A. No.
23    Q. Have you sought treatment for lower back pain
24  since this accident with Mr. Perdue?
25    A. Yes.

---

**Page 85**

1    Q. Give an estimate. Since this accident
2  happened, it would have been October 20, 2001, about
3  how many times do you think you have sought treatment
4  for lower back pain?
5    A. Since the accident?
6    Q. Yes.
7    A. I don't know. Probably every time I go to
8  the doctor.
9    Q. And have you had any incident that has
10  increased that lower back pain since this accident
11  with Mr. Perdue?
12    A. No.
13    Q. Would you agree with me that your lower back
14  pain has been constant and unaffected by this
15  accident with Mr. Perdue?
16    A. That is correct.
17    Q. In July of 2003, were you fighting and hurt
18  your right hand?
19    A. Yes.
20    Q. You broke it, didn't you?
21    A. Yes, I did.
22    Q. And did you seek treatment?
23    A. Yes, I did.
24    Q. And why wasn't that injury to your right hand
25  mentioned in the Interrogatory No. 10?

---

22 (Pages 82 to 85)